IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| PATRICIA GAYLE FALLON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-04-2904 |
| | § | |
| FORTIS HEALTH, ASSURANT HEALTH, | § | |
| ASSURANT, INC., FORTIS BENEFITS | § | |
| INSURANCE COMPANY, and TEXAS | § | |
| FEDERATION OF TEACHERS EMPLOYEE | § | |
| WELFARE BENEFITS PLAN, | § | |
| | § | |
| Defendants. | § | |

**<u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>**

<u>Preliminary Statement</u>

Plaintiff Patricia Gayle Fallon ("Plaintiff") brought this suit to recover  benefits under a health insurance policy issued by Fortis Benefits Insurance Company ("FBIC" or "Fortis").  The case came on for trial to the Court on December 5, 2005, and later that day the parties rested and closed the evidence.  Pursuant to the holding of <u>Vega v. National Life Ins. Servs., Inc.</u>, 188 F.3d 287, 299 (5th Cir. 1999), the Court, in considering Plaintiff's claim for benefits under ERISA § 502(a)(1)(B), is constrained to the evidence in the administrative record that had been compiled by FBIC before Plaintiff filed suit (the "Administrative Record"), with the very limited exceptions approved by <u>Vega</u>.  After receiving and considering the evidence, and the arguments and authorities

presented by counsel both at trial and in their trial briefs and replies thereto, the Court now makes the following Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52.

## I.  Findings of Fact

**From a preponderance of the evidence, the Court finds as follows:**

### The Policy and FBIC's Authority

1.   FBIC issued Group Policy No. 554249 (the "Policy") to the Upper Midwest Employers Group Trust (the "Trust"), which sponsors the Upper Midwest Employers' Group Plan (the "Plan").  FBIC Cert. at 0001-0076.[1]  The Policy provides group health insurance for employees of participating employers under the Trust and is underwritten and administered by FBIC.

2.   Plaintiff is covered under the Policy as a full-time employee of the Texas Federation of Teachers ("TFT"), a participating employer under the Trust.  Plaintiff's coverage was in effect during the time material to her claims.

---

[1] FBIC has provided the Court with a copy of the entire Administrative Record, which is Bates labeled in three different sections: (1) FBIC Certificate; (2) FBIC Application; and (3) FBIC Record.  Hereinafter, citations to the Administrative Record will be as follows: (1) FBIC Cert. at __; (2) FBIC App. at __; and (3) FBIC Rec. at __.  Although Plaintiff suggests that the Plan is in written form, it was not included in the Administrative Record or submitted to this Court during the trial.

3.    Under the heading "Authority," the Policy provides:

> We have the sole authority to determine eligibility
> for participation or benefits and to interpret the
> terms of the *policy*.   All determinations and
> interpretations made by us are conclusive and
> binding on all parties.

Id. at 0061.   The Policy defines the terms "we" and "us" to mean

FBIC.   Id. at 0020.

4.    Under the heading "Plan Administrator," the Policy

provides:

> The *plan administrator* is usually your *partici-*
> *pating employer*.   The *plan administrator* delegates
> to us the authority, responsibility, and discretion
> to determine all questions regarding eligibility
> for coverage and benefit adjudications under the
> *policy*, and to interpret and construe the terms and
> provisions of the *policy*. . . . The construction,
> interpretation, or determination of the *policy* and
> its terms by us shall be final and binding on all
> parties.

FBIC Cert. at 0062.

5.    Under the Policy, FBIC was both the party charged with

determining whether to approve and pay claims and the insurer

responsible for paying approved claims.

<u>The Administrative Record's Evidence of Plaintiff's Surgery and
FBIC's Consideration of Plaintiff's Claim and Denial Thereof</u>

6.    Plaintiff visited Dr. Sik Choo in May 2000 and again in

January 2001, but the Administrative Record contains no evidence

from which the nature of these visits can be determined.  *See* FBIC
Rec. at 0365-0369, 0375-0383.  Plaintiff visited Dr. Choo again in
June 2002, and Dr. Choo ordered a CT Scan of Plaintiff's lumbar
spine.  Id. at 0263-64, 0384-0388.  Under the heading, "History,"
the CT Scan report states, "Low back pain, bilateral hip pain, knee
and leg pain.  No previous back surgery."  Id. at 0263. Under the
heading, "Impression," the CT Scan report states as follows:

> 1.    Hyperlordosis of the lumbosacral transition.  There
> is no spinal stenosis.
>
> 2.    Minimal grade I spondylolisthesis of L5 on S1
> without tear.  The intervening disc is slightly reduced
> in height.
>
> 3.    There is bilateral facet hypertrophy and facet
> arthropathy at L4-5 and L5 to S1.  Due to the abundant
> sclerosis, pars defects of L5 cannot be reliably
> excluded.
>
> 4.    There is mild bilateral . . . stenosis at L5 to S1
> with conceivable impingement upon the exiting L5 nerve
> roots.
>
> 5.    Degenerative disc desiccation and endplate sclerosis
> at L1-2.
>
> 6.    Bulging but not extruded discs at L3-4 and L4-5
> without nerve root displacement.

Id. at 0264.  Plaintiff cites no evidence in the Administrative
Record attributing these findings to her breast size, nor did

Plaintiff produce evidence at trial to assist the Court in understanding these medical findings.[2]

7. On October 3, 2002, Plaintiff was referred by Dr. Gayle Rothenberg to Dr. Steven Hamilton, a plastic and reconstructive surgeon. Id. at 0236. During his evaluation of Plaintiff, Dr. Hamilton made the following notes:

> [Plaintiff] has significant ventral hernia recurrence above the umbilicus; approximately 6 to 8 cm across, that was originally treated and repaired with Marlex. She has a significant abdominal laxity and a belt lipodystrophy. To improve her abdominal appearance she would need an abdominoplasty, repair of some diastasis. However, significant weight loss would need to occur before more diastasis could be repaired. She needs a belt lipectomy and liposuction in her flanks. She is also interested in breast reduction; she has a double-D breast with significant back pathology previously documented as certainly related to her significantly heavy breasts.[3] I have recommended, pending medical clearance and length of surgery, that she consider abdominoplasty, belt lipectomy with flank liposuction, to incorporate a ventral hernia repair.

Id.

---

[2] Although Plaintiff states in her brief that she "has a documented history of chronic leg pain, back pain, and neck strain," that "under Dr. Choo's care, [she] followed a conservative non-surgical treatment regimen, only to suffer significant continued back, shoulder, and neck pain," and that "Dr. Choo recommended a permanent surgical remedy for [her] condition," Plaintiff's citations to the Administrative Record do not support these statements. See Document No. 43 ¶ 15.

[3] Nothing in the Administrative Record discloses what Dr. Hamilton was relying on when he noted that Plaintiff had "significant back pathology previously documented as certainly related to her significantly heavy breasts."

8.   By letter dated October 23, 2002, Dr. Hamilton wrote FBIC to request pre-certification for a bilateral breast reduction mammaplasty, which was scheduled for December 11, 2002 and was expected to necessitate a one to two day hospital stay.  Id. at 0014-15.  The letter states that on October 3, 2002,Dr. Hamilton evaluated Plaintiff, "a 57 year old female, 5'2", 179 pounds," "with complaints of large, pendulous, heavy breasts with shoulder and back pain."  Id.   The letter further states that Plaintiff "has a history of hypertrophy which has resulted in breakage of small vessels and deep grooving in the bra strap area, chronic irritation of the shoulder area, difficulty breathing, and mid thoracic spine and cervical spine pain."  Id.  According to Dr. Hamilton, "[o]n evaluation, there is easily over 500 grams per side which will need to be removed in order to alleviate the patient's significant hypertrophy of her breast and to unstress her neck and shoulders."  Id.  Dr. Hamilton neither mentions nor requests pre-certification for a hernia repair, abdominoplasty, belt lipectomy, and/or liposuction.  Id.

9.   By letter dated October 31, 2002 (but forwarded to FBIC by facsimile on November 6, 2002), Dr. Hamilton requested pre-certification for a ventral hernia repair.  Id. at 0018-19.  The letter states that Plaintiff was evaluated on October 3, 2002 "with a multitude of abdominal wall and chest wall related issues requiring reconstructive surgery."  Id. at 0019.  Specifically, Dr.

6

Hamilton explains that Plaintiff "has undergone a previous ventral hernia repair . . . which has reoccurred"; that "[i]t is assumed that it is an incisional hernia, which although repaired, dehisced and now requires secondary repair"; that there was also "significant penicillus in the abdomen which will require addressing at the time"; and that "[i]t is our clinical opinion that the recurrent hernia risks entrapment if it is not addressed." Id. Again, the letter does not mention abdominoplasty, belt lipectomy, or liposuction.  Id.

In addition, the letter states that "with a long history of chronic back and neck strain documented by other physicians, the patient desires breast reduction surgery at a concomitant time to her abdominal surgery."  Id.[4]  "Despite conservative therapy for back, shoulder, and neck pain," Dr. Hamilton explains, Plaintiff "has been unrelieved by conservative methods and is seeking breast reduction surgery for significant relief of the strain of her excessive breast size."  Id.  According to Dr. Hamilton, the clinical criteria for both the abdominal wall repair and for the breast reduction rise to the medical criteria for treatment both in terms of recurrent hernia and risk of future entrapment and in terms of chronic pain and strain on the upper cervical and thoracic spines."  Id.

---

[4] The documentation to which Dr. Hamilton refers does not appear to be part of the Administrative Record.

7

10.   The Policy defines the term "Cosmetic Services" as follows:

> A procedure, medication, or treatment designed primarily to improve appearance, self-esteem or body image and/or relieve or prevent social, emotional or psychological distress.

Id. at 0009.   The Policy expressly excludes from coverage "*[c]osmetic services* and reconstructive surgery except as stated in the Covered Medical Services section." FBIC Cert. at 0042.   With respect to reconstructive surgery, the "Other Covered [Medical] Services" section states in pertinent part:

> Reconstructive Surgery required because of an *illness*, *injury* or congenital disease or anomaly; . . . and surgery which is incidental to or follows surgery resulting from *illness* or *injury* of the involved part including but not limited to reconstructive surgery on one or both breasts to establish symmetry between the breasts following *medically necessary* removal of all or part of a diseased breast and surgical reconstruction of the non-diseased breast to achieve symmetry. *Cosmetic services* and services for complications from cosmetic services are not covered regardless of whether the initial surgery occurred while the *covered person* was covered under this plan or any previous coverage.

Id. at 0029.

11.   According to FBIC's written Clinical Decision Making policy for Breast Surgery, a bilateral reduction mammoplasty is a cosmetic procedure if any of the following apply: (1) the patient is under age 18; (2) the patient's BMI is greater than 30; (3) the

8

proposed tissue removal is less than 1,000 grams; and/or (4) the patient does not have a well documented history of six months of back, neck, or shoulder pain and documented failure of six months of conservative therapy.   FBIC Rec. at 0079-80.

12.   There is no evidence that FBIC failed consistently to apply the foregoing policy to pre-certification requests for breast reduction mammoplasty procedures.

13.   On November 6, 2002, FBIC considered Plaintiff's pre-certification requests.   Id. at 0487.   Based on Dr. Hamilton's statement that Plaintiff was 5'2" and weighed 179 pounds, an FBIC representative calculated Plaintiff's body mass index ("BMI") to be 32.81 and concluded that because Plaintiff's BMI exceeded 30, the mammoplasty was cosmetic.   Id.[5]

14.   In addition, Dr. Brumblay determined that although Plaintiff's ventral hernia repair was medically necessary, the abdominoplasty, belt lipectomy, and liposuction were cosmetic.   Id. In making this determination, Dr. Brumblay noted that the "record contains no information to show that abdominoplasty or belt lipectomy is for any purpose other than improving appearance" and that the "record indicates that abdominoplasty is to improve abdominal appearance."   Id.

---

[5] Although FBIC contends that FBIC Medical Director Dr. R. Scott Brumblay made this determination, it appears from FBIC's records that the determination was actually made by an FBIC representative named Hellman.   See FBIC Rec. at 0487.

9

15. FBIC promptly contacted Dr. Hamilton's office by telephone to inform him that only the ventral hernia repair would be covered under the Policy. <u>Id.</u>

16. On November 7, 2002, FBIC sent a letter to Dr. Hamilton informing him of its determination that Plaintiff's requested abdominoplasty, belt lipectomy, flank liposuction, and a breast reduction mammoplasty were cosmetic services and were therefore excluded from coverage under the Policy:

> The abdominoplasty, belt lipectomy, and flank liposuction are intended to improve appearance. There is no functional impairment and therefore the procedure is cosmetic. The breast reduction mammoplasty is requested for a patient whose body mass index is greater than 30 kg/m. Obesity is frequently associated with similar back and neck symptoms and is associated with increased surgical morbidity.

<u>Id.</u> at 0035.

17. On November 8, 2002, an FBIC representative contacted Plaintiff by telephone to notify her of FBIC's coverage determination. <u>Id.</u> at 0488. Plaintiff was irate and stated that she would have her attorney contact FBIC. <u>Id.</u> Plaintiff also asserted that "other people in her office have been approved by Fortis for breast reduction" and that she could not understand why her breast reduction would not be covered if she had a herniated disc. <u>Id.</u> The representative explained to Plaintiff that the

mammoplasty was considered cosmetic because her BMI was greater than 30 and informed her of the appeals process. Id.

18. After having been notified by FBIC that the mammoplasty, abdominoplasty, belt lipectomy, and flank liposuction would not be covered services, Plaintiff nonetheless elected to have the mammoplasty, abdominoplasty, belt lipectomy, flank lipsuction procedures when she underwent surgery for the ventral hernia repair on November 11, 2002. Id. at 0120, 0224-25.

19. During the surgery, Dr. Hamilton first performed the mammoplasty, removing 586 grams from Plaintiff's left breast and 267 grams from her right breast. Id. at 0224. Dr. Hamilton then turned to the abdominoplasty and ventral hernia repair. Id. at 0225. Finally, Dr. Hamilton trimmed excess skin and fat from Plaintiff. Id.

20. Although Dr. Hamilton noted in his surgical procedure report that he discovered "significant adhesions and scar tissue" and a "recurrent incarcerated colonic hernia . . . in an area of previous hernia repair" during the ventral hernia repair, see id. at 0225, Dr. Hamilton's surgical procedure report does not support Plaintiff's contention that "massive internal scar tissue" had "trapped [Plaintiff's] intestine and was turning part of the intestine septic," "a life-threatening condition that required additional, unplanned emergency surgery and hospitalization." See Document No. 43 ¶ 25. Moreover, there is no evidence in the

Administrative Record that "the extent of repairs to [Plaintiff]'s abdominal wall required reconstructive abdominoplasty anyway." <u>Id.</u>

21.   The surgery lasted approximately 12.5 hours, after which Plaintiff spent three days recovering in the hospital.   <u>Id.</u> at 0120, 0213.

22.   The total cost of Plaintiff's hospital bill was $43,140.35.   <u>Id.</u> at 440.

Plaintiff's Appeals to FBIC

23.   On November 9, 2002, Plaintiff submitted to FBIC's Utilization Review Board a formal written appeal specifically requesting a reconsideration of the denial of her mammoplasty procedure.   <u>Id.</u> at 0038.

24.   Nine days later FBIC received from the Texas Department of Insurance notice that Plaintiff had filed an official complaint against FBIC.   <u>Id.</u> at 0043-45.   Attached to the notice was Plaintiff's complaint narrative, in which she stated:

> I have been diagnosed with back trouble.  This was confirmed with X-rays of the back that revealed a problem with the discs in the lower back.  I was scheduled for hernia surgery and the doctor recommended that I also have a bilateral breast reduction to relieve the pain in the back.  He indicated to the insurance company that it was a medical necessity and verified this by providing the test results from the imaging center.  Fortis approved the hernia surgery and denied the breast reduction by alleging that it is cosmetic.  When I spoke to them, they stated that based on my height and weight, their charts stated that I have a BMI

12

> of 30 and that any time there is a BMI of 30 they
> consider it cosmetic. I referred them to the
> medical report and they stated it did not matter.
> I further informed Fortis that they had funded two
> other bilateral breast reductions in my office--one
> for an employee who is very thin and the other for
> an employee who is severely overweight. They could
> not provide an answer as to why these were approved
> and I was denied. . . . I would like to see Fortis
> forced to reimburse me for all claims related to
> the bilateral breast reduction that I have had to
> personally pay.

Id. at 0045.

25. On November 20, 2002, FBIC obtained hospital records from Plaintiff's surgery. Id. at 0488. Dr. Brumblay reviewed those records the following day. Id. Dr. Brumblay noted that "[t]he approved hernia surgery is typically an outpatient stay," and that the medical "records provided show no complications related to the hernia surgery." Id. Dr. Brumblay therefore concluded that the cause of Plaintiff's hospitalization was her decision to undergo multiple surgeries. Id. Accordingly, FBIC denied coverage for Plaintiff's hospitalization as "treatment for a cosmetic procedure" not covered by the Policy. Id.

26. On November 22, 2002, FBIC Medical Director Dr. Charlotte Heidenreich reviewed Plaintiff's appeal and upheld the denial of coverage. Id. at 0489. Dr. Heidenreich concluded that Plaintiff's mammoplasty was a cosmetic procedure because Plaintiff's BMI was greater than 30. Id. Additionally, Dr. Heidenreich determined that Plaintiff's abdominoplasty, belt lipectomy, and liposuction

were cosmetic procedures based on the following statements in Dr. Hamilton's October 3, 2002 evaluation notes: "To improve her abdominal appearance she would need an abdominoplasty, repair of some diastasis . . . She needs a belt lipectomy and liposuction in her flanks." Id.

27. On November 27, 2002, FBIC answered the Texas Department of Insurance, explaining its denial of Plaintiff's mammoplasty claim. Id. at 0049-50. FBIC also notified Plaintiff of this correspondence. Id. at 0052.

28. On January 23, 2003, Paul Vahldiek, an attorney for Plaintiff, wrote FBIC to initiate a first level grievance appeal concerning Plaintiff's "in-patient hospitalization at St. Luke's Episcopal Hospital during November 2002, the predetermination of her breast reduction and any other unpaid claims." Id. at 0123-24. FBIC responded by letter dated January 28, 2003, informing Mr. Vahldiek that the Correspondence Department was conducting a review based on his appeal and requesting that he submit a written authorization to disclose confidential information from Plaintiff. Id. at 0122.

29. On May 20, 2003, Mr. Vahldiek supplied FBIC with medical records that it had requested relating to Plaintiff's preoperative visits and hospital stay. Id. at 0129-30. The new documents, along with the original file, were then submitted for physician review. Id. at 0489.

30.   On May 28, 2003, FBIC's Chief Medical Officer Dr. Ken Beckman upheld the decisions of Drs. Brumblay and Heidenreich.   Id. at 0489.   Specifically, Dr. Beckman made the following findings:

1.   The liposuction of her flanks is cosmetic.  There is no other indication for this procedure.  She had 3,850 cc of fat removed with this procedure.

2.   The tummy tuck or abdominoplasty in [sic] cosmetic. The indication for this was "significant abdominal laxity."  On 10/3/2003, the Provider documented, "To improve her abdominal appearance she would need an abdominoplasty, repair of some diastasis.  However, significant weight loss would need to occur before more diastasis could be repaired."  This procedure is not an integral part of the medically necessary ventral hernia repair.

3.   Breast reduction is cosmetic.   The patient was referred to the surgeon because of her recurrent ventral hernia (procedure approved) and while there stated that she was interested in a breast reduction.  A statement is made that her significant back pathology "was certainly related to her heavy breasts."  However, there is no documentation of any examination of her back.  The back problems are focused on her lower back and there is no documentation of any relationship between her breast size and her lower lumbar degenerative disc disease.   The patient is significantly obese.  She had a BMI of over 33 at the time of surgery.  Obesity is well documented as a causative factor in back pain.  The surgeon also stated in the predetermination that the patient would "easily meet the criteria of 500 grams per side to be removed." Pathology documents that she had 586 grams removed from the left breast and 267 grams removed from the right breast.

Id.  Dr. Beckman noted, however, that "the prior approval should cover all hospital days and ancillary services.   The hospital record suggests that the extended length of stay was a result of the hernia repair and not of the denied cosmetic procedures.   The

operating room and anesthesiology charges should be adjusted to reflect the time spent on each procedure." Id.

31. Accordingly, on June 11, 2003, FBIC asked St. Luke's Hospital what portion of the total hospital charges related to Plaintiff's ventral hernia repair. Id. at 0127. Linda Green, at St. Luke's, informed FBIC that the total hospital charges for Plaintiff's procedures was $43,140.35, of which $33,474.65 related to the cosmetic services and $9,665.70 related to the ventral hernia repair. Id. There is no evidence in the Administrative Record that any of the charges St. Luke's attributed to cosmetic procedures were in fact attributable to Plaintiff's covered ventral hernia repair.

32. On June 16, 2003, FBIC informed Mr. Vahldiek by letter that in reviewing Plaintiff's medical expenses, "it was noted that the claim from St. Luke's Episcopal Hospital included charges for services related to [Plaintiff's] bilateral breast reduction, abdominoplasty, liposuction, and ventral hernia repair." Id. at 0283-84. Thus, FBIC explained, "[i]n order to determine our liability on this expense we contacted St. Luke's Episcopal Hospital to verify the total charge for treatment related to the ventral hernia repair," and "St. Luke's Episcopal Hospital has informed us that total charge for the ventral hernia repair is $9,665.70." Id. On June 19, 2003, FBIC informed Plaintiff through its explanation of benefits that $9,665.70 was a covered expense

16

and paid the negotiated rate in accordance with its Private Healthcare Systems provider agreement. <u>Id.</u> at 0438.

33. On November 21, 2003, FBIC received on behalf of Plaintiff a letter from another attorney, W. Fulton Broemer, demanding that FBIC pay the entirety of Plaintiff's claim. <u>Id.</u> at 0290-91. FBIC treated the letter as a second level grievance appeal. <u>Id.</u> at 0294-97. After reviewing the prior determinations, the submitted medical records, and the appeal letter, FBIC Medical Director Dr. Robert Dachelet upheld the denial of charges related to the mammoplasty, liposuction, and abdominoplasty:

> There is no new medical information submitted for this review. Appeal letter dated 11-21-03 states prior approval was obtained before surgical procedures; approval was given only for repair of recurrent ventral hernia, not for procedures in question. Appeal letter states "life threatening" infection was discovered which necessitated additional emergency surgery; this is not documented in original operative report which was dictated 3-4-03 for procedure done 11-11-02, or in hospital notes following procedures. Denial as cosmetic is upheld.

<u>Id.</u> at 0299. Dr. Dachelet's determination was then reviewed by FBIC's Grievance Panel, which also upheld the denial and informed Plaintiff of its decision by letter dated January 26, 2004. <u>Id.</u> at 0302-03. However, FBIC's letter also stated as follows:

> [A]ll charges related to the ventral hernia repair were previously considered. The total billed amount from St. Luke's Episcopal Hospital for November 11, 2002 through November 14, 2002 was

> $43,140.35.  We had previously determined that the
> total charge for the ventral hernia repair was
> $9,665.70.  Therefore, this amount was considered
> and processed pursuant to the terms of Ms. Fallon's
> plan.  The remaining charges were denied as related
> to the cosmetic procedures.
>
> Please note that we have determined to reconsider
> the hospital charges from November 12, 2002 through
> November 14, 2002.  Upon further review of the
> itemized claim from the hospital, we determined
> that the total charge for these dates are
> $2,000.30.  This amount will be reconsidered
> pursuant to the provisions of Ms. Fallon's plan.

Id. at 0303.  Finally, the letter informed Plaintiff that "[t]he Grievance Panel is the final step in our administrative grievance process; therefore, all avenues in this process have been exhausted." Id.

34.  On February 10, 2004, FBIC informed Plaintiff through its Explanation of Benefits that $2,000.30 was an additional covered expense and paid the negotiated rate in accordance with its Private Healthcare Systems provider agreement. Id. at 0434-36.  Thus, FBIC's payments for hospital charges related to Plaintiff's ventral hernia repair totaled $11,666.00.

35.  The evidence in the Administrative Record is that FBIC paid for all hospital charges attributable to the covered ventral hernia repair.

36.  Although the four doctors who separately reviewed Plaintiff's claims for FBIC were all employed by FBIC, there is no evidence that the doctors failed fairly and accurately to review

18

all of the information submitted in support of Plaintiff's claims for benefits.

37.   There is no evidence that the conflict of interest inherent in FBIC acting both as insurer and as administrator of claims had any influence on FBIC's denial of coverage in this case.

38.   There is no evidence that FBIC failed to give the Policy a uniform construction.

39.   FBIC's denial of coverage is clearly supported in the Administrative Record by concrete, substantial evidence that the disputed surgeries were cosmetic and not medically necessary, and hence, not covered by the Policy as its terms were uniformly defined and applied.

40.   Recognizing that FBIC's discretion deserves a modicum less deference than is accorded to an insurer who does not also serve as administrator, FBIC nonetheless did not abuse its discretion in its interpretation of the Policy and denial of Plaintiff's claims.

## II.   Conclusions of Law

**The Court makes the following conclusions of law:**

1.   The Court has jurisdiction over the parties and the subject matter.

2.   Venue properly lies in this district and division.

3.   The Plan is an employee welfare benefit plan governed by ERISA.   The Policy is the instrument under which the Plan is operated.

4.   FBIC is the claims administrator of the Policy and a fiduciary within the meaning of ERISA.

5.   Unless the terms of the instrument under which the plan is operated give to the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the instrument, the administrator's or fiduciary's decision to deny benefits is reviewed *de novo*.  *See* <u>Firestone Tire and Rubber Co. v. Bruch</u>, 109 S. Ct. 948, 956-57 (1989); <u>Bratton v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.</u>, 215 F.3d at 521. When, however, an administrator or fiduciary has discretionary authority with respect to the decision at issue, the standard of review is one of abuse of discretion.  <u>Vega</u>, 188 F.3d at 295.

6.   The Policy expressly grants to FBIC "the sole authority to determine eligibility for participation or benefits and to interpret the terms of the *policy*" and "the authority, responsibility, and discretion to determine all questions regarding eligibility for coverage and benefit adjudications under the *policy*, and to interpret and construe the terms and provisions of the *policy*."  FBIC Cert. at 0061.  Thus, FBIC's interpretation and/or construction of the Policy is reviewed for abuse of discretion.

7.   A   two-step   analysis   is   ordinarily   employed   for determining   whether   an   administrator   abused   its   discretion   in construing the terms of a plan or policy.   <u>Vercher v. Alexander & Alexander, Inc.</u>, 379 F.3d 222, 227 (5th Cir. 2004) (citing <u>Rhorer v. Raytheon Eng'rs & Constr'rs, Inc.</u>, 181 F.3d 634, 639 (5th Cir. 1999)).

8.   The   court   first   determines   the   legally   correct interpretation   of   the   plan   or   policy   and   whether   the administrator's   interpretation   accords   with   the   proper   legal interpretation.   <i>See</i> <u>id.</u>   If the administrator's construction is legally sound, then no abuse of discretion occurred and the inquiry ends. <i>See</i> <u>id.</u>

9.   But if the court concludes that the administrator has not given the plan or policy the legally correct interpretation, the court   must   then   determine   whether   the   administrator's interpretation constitutes an abuse of discretion.   <u>Vercher</u>, 379 F.3d at 227 (citing <u>Rhorer</u>, 181 F.3d at 639-40).

10.   In ascertaining the legally correct interpretation of the Policy, the Court considers: "(1) whether a uniform construction of the policy has been given by the administrator, (2) whether the interpretation   is   fair   and   reasonable,   and   (3)   whether unanticipated costs will result from a different interpretation of the policy."   <u>Lain v. UNUM Life Ins. Co. of Am.</u>, 279 F.3d 337, 344 (5th Cir. 2002).

11.   Although the Administrative Record contains Plaintiff's assertion that FBIC approved coverage for breast reduction mammoplasty procedures for two of Plaintiff's co-workers, there is no evidence: (1) that the co-workers' BMIs were greater than 30, such that FBIC should have, in applying its written Clinical Decision Making policy for Breast Surgery, determined that the co-workers' mammoplasties were cosmetic procedures excluded from coverage under the Policy; or (2) that FBIC otherwise determined that the co-workers' mammoplasties were "Cosmetic Services" within the meaning of the Policy, but may have extended coverage to those procedures anyway.  *See* Document No. 43 exs. A-B.[6]

12.   Because there is no evidence that FBIC failed to give the Policy a uniform construction, the Court proceeds to the other two factors.  Atteberry v. Memorial-Hermann Healthcare Sys. ex rel.

---

[6] FBIC objects to and moves to strike the affidavits of Plaintiff's co-workers filed by Plaintiff in her post-trial brief on the ground that they fall outside the Administrative Record. *See* Document No. 46.  Plaintiff did not identify or call these two persons as witnesses at trial.  Extrinsic evidence "related to how an administrator has interpreted the terms of the plan in other instances is admissible."  *See* Vega, 188 F.3d at 299; *accord* Bratton, 215 F.3d at 521 ("[A] court may look beyond the [administrative] record for 'evidence related to how an administrator has interpreted the terms of the plan in other instances.'").  The post-trial affidavits, of course, are hearsay, although FBIC has not objected on that ground.  FBIC's Motion to Strike (Document No. 46) is therefore DENIED.  The affidavits themselves, however, simply state that the affiants' each had breast reduction surgery for which FBIC provided coverage under the Policy, but the affidavits provide no information from which to infer that either of those surgeries was for cosmetic purposes or was not medically necessary as those terms were applied to Plaintiff in FBIC's interpretation of the Policy.

<u>Atteberry</u>, 405 F.3d 344, 349 (5th Cir. 2005) (citing <u>Pickrom v.</u>
<u>Belger Cartage Serv., Inc.</u>, 57 F.3d 468, 471 (5th Cir. 1995)).

13.  Under the Policy, coverage is provided for "allowable
charge[s], as determined by [FBIC], which [are]: (a) for services
or supplies provided by a *physician*, facility or supplier; (b) for
services or supplies which are *medically necessary*; (c) incurred by
a covered person, while insured under the *policy*, for an illness or
injury . . .; and (d) for services or supplies listed in the
Covered Medical Services . . . sections of the *policy*; and (e) not
listed in the Exclusions section of the *policy*.  FBIC Cert. at
0009.  The "Exclusions" section of the Policy explains that FBIC
"will not pay benefits for any of the following: . . . 8.  Cosmetic
services and reconstructive surgery except as stated in the Covered
Medical Services section."  <u>Id.</u> at 0042.  Under the subheading
"Reconstructive Surgery," the Covered Medical Services section
states, "Cosmetic services and services for complications from
cosmetic services are not covered regardless of whether the initial
surgery occurred while the covered person was covered under this
plan or any previous coverage."  <u>Id.</u> at 0029.

Given FBIC's factual determination that Plaintiff's
abdominoplasty, belt lipectomy, flank lipsuction, and mammoplasty
were "Cosmetic Services" within the meaning of the Policy, FBIC's
conclusion that those services were not covered under the Policy
was fair and reasonable and in accordance with the legally correct

23

interpretation of the Policy's terms.[7]  Thus, FBIC did not abuse its discretion in construing the Policy's terms.

14.  Plaintiff contends, however, that FBIC erred in determining that her abdominoplasty, belt lipectomy, liposuction, and mammoplasty were "Cosmetic Services."  The Court reviews this factual determination for abuse of discretion.  *See* Meditrust Fin. Servs. Corp. v. Sterling Chems., Inc., 168 F.3d 211, 213 (5th Cir. 1999) ("Regardless of the administrator's ultimate authority to determine benefit eligibility, . . . factual determinations made by the administrator during the course of a benefits review will be rejected only upon the showing of an abuse of discretion."); *see also* Bratton, 215 F.3d at 522 ("For factual determinations under ERISA plans, . . . we have held that federal courts owe due deference to an administrator's findings and, for their review, the abuse of discretion standard is appropriate.").

15.  When applying the abuse of discretion standard to an administrator's factual determinations, a court's task is to determine whether the administrator acted arbitrarily or capriciously.  Meditrust, 168 F.3d at 214; *see also* Lain, 279 F.3d at 342.[8]

---

[7] The Administrative Record contains no evidence bearing on the third factor.

[8] In the Fifth Circuit, there is only a semantic, not a substantive, difference between the arbitrary and capricious and the abuse of discretion standards in the ERISA benefits review context.  *See* Baker v. Metro. Life Ins. Co., 364 F.3d 624, 629 n.9 (5th Cir. 2004).

16.  "A decision is arbitrary only if 'made without a rational connection between the known facts and the decision or between the found facts and the evidence.'"  <u>Meditrust</u>, 168 F.3d at 215 (quoting <u>Bellaire Gen. Hosp. v. Blue Cross Blue Shield of Mich.</u>, 97 F.3d 822, 828 (5th Cir. 1996)).

17.  However, "[t]he abuse of discretion standard requires that the administrator's factual determinations be supported by substantial evidence." <u>Albert v. Life Ins. Co. of N. Am.</u>, No. 04-20933, 2005 WL 3271283, at *2 (5th Cir. Dec. 2, 2005) (citing <u>Meditrust</u>, 168 F.3d at 215). "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Ellis v. Liberty Life Assurance Co. of Boston</u>, 394 F.3d 262, 273 (5th Cir. 2004) (internal quotations and citations omitted).  If the administrator's decision "is supported by substantial evidence and is not arbitrary and capricious, it must prevail." <u>Id.</u>

18.  Nevertheless, an administrator's decision to deny a claim must "be based on evidence, even if disputable, that clearly supports the basis for its denial." <u>Vega</u>, 188 F.3d at 299.

19.  In order to uphold the administrator's decision, the Court must determine "that [it] fall[s] somewhere on a continuum of reasonableness--even if on the low end." <u>Vega</u>, 188 F.3d at 297.

20.  This standard of review is somewhat less deferential where the administrator is operating under a conflict of interest. *See* <u>Bratton</u>, 215 F.3d at 521 n.4 ("The existence of a conflict is a factor to be considered in determining whether the administrator abused its discretion in denying a claim.  The greater the evidence of conflict on the part of the administrator, the less deferential the abuse of discretion standard will be.  Under this 'sliding scale' standard, the court applies the abuse of discretion standard, giving less deference to the administrator in proportion to the administrator's apparent conflict.") (citing <u>Vega</u>, 188 F.3d at 296-97, 299).

21.  The Court's analysis of whether FBIC abused its discretion is informed by FBIC's role as both the party charged with determining whether to approve and pay claims under the Policy, and the insurer responsible for paying approved claims. *See* <u>Gooden v. Provident Life & Accident Ins. Co.</u>, 250 F.3d 329, 333 (5th Cir. 2001); *see also* <u>Vega</u>, 188 F.3d at 289; <u>Lain</u>, 279 F.3d at 343.  As such, FBIC is self-interested, in that it "potentially benefits from every denied claim," and this situation creates a conflict of interest.  <u>Gooden</u>, 250 F.3d at 333 (quoting <u>Vega</u>, 188 F.3d at 295).  Plaintiff has not, however, presented any evidence-- extrinsic or otherwise--with respect to the degree of the conflict. For example, there is no evidence before the Court that FBIC infused its inherent conflict of interest into its claims

department employees and physicians who reviewed Plaintiff's claims.  The Court therefore applies the "sliding scale" standard and reviews FBIC's decision for abuse of discretion with only a "modicum less deference" than would otherwise be appropriate. <u>Vega</u>, 188 F.3d at 297; *see also* <u>Lain</u>, 279 F.3d at 343.

22.  With respect to the question of what evidence the Court may consider in determining whether FBIC abused its discretion, the Fifth Circuit has been clear: "when assessing factual questions, the district court is constrained to the evidence before the [policy] administrator." <u>Vega</u>, 188 F.3d at 299.  "As a result, a district court must inquire only whether the 'record adequately supports the administrator's decision'; from that inquiry, it can conclude that the administrator abused its discretion if the administrator denied the claim '[w]ithout some concrete evidence in the administrative record.'" <u>Gooden</u>, 250 F.3d at 333 (quoting <u>Vega</u>, 188 F.3d at 298, 302).

23.  FBIC did not abuse its discretion when it denied Plaintiff's claims because its decision is supported by substantial, concrete evidence in the Administrative Record.

24.  With respect to the mammoplasty, FBIC determined--in light of  FBIC's Clinical Decision Making policy for Breast Surgery, Plaintiff's BMI of 32.81, and Dr. Hamilton's evaluation notes and pre-certification request--that Plaintiff's breast reduction surgery was a cosmetic, rather than a medically

necessary, procedure.  On appeal, FBIC affirmed its decision after Drs. Heidenreich, Beckman, and Dachelet each independently reviewed the submitted records and agreed that the mammoplasty was indeed cosmetic.

25.  FBIC's Clinical Decision Making policy for Breast Surgery states:

> The indications for elective bilateral breast reduction are both subjective and objective in nature.  Complaints of pain are difficult to substantiate.  Shoulder grooving and skin rashes can often be treated with improved support and improved hygiene.  None of the published literature provides outcomes for women who undergo reduction of less than 1,000 grams of total tissue removal. Obesity is considered a relative contraindication because of both the additional complications and the potential for weight reduction to relieve or partially relieve the presenting symptoms.

FBIC. Rec. at 0079.  Thus, according to the policy, a bilateral breast reduction mammoplasty is a medically necessary procedure only if the patient "[m]eets all of the following criteria":

- Age 〉 18

- BMI 〈 30

- Proposed tissue removal 〉 1,000 grams

- Failed 6 months of conservative therapy

FBIC Rec. at 0080.  Conversely, a bilateral breast reduction mammoplasty is a cosmetic procedure when any of the following apply:

- Patient is under age 18.  Full skeletal growth is typically not achieved until this age. Published studies have been limited to adults. (This criteria may be waived if radiological evidence of bone maturity is provided, i.e., complete osseous closure of clavicle).

- Patient's Body Mass Index (BMI) is ⟩ 30 kg/m$^2$. Obesity is frequently associated with similar back and neck symptoms and is associated with increased surgical morbidity.

- Proposed tissue removal is less than 1,000 grams.  Published studies are limited to average tissue removal of ⟩ 1,200 grams.

- Patient does not have a well documented history of six months of back, neck or shoulder pain and documented failure of six months of conservative therapy.  Evaluation should include a thorough exam by a qualified provider for other causes of symptoms. Treatment may include analgesics, custom-support garments, physical therapy, back-strengthening program and other measures designed to relieve discomfort and improve the muscular support structure of the chest, neck and back.

Id.  The evidence is that Plaintiff's BMI was greater than 30 when Plaintiff requested pre-certification for her mammoplasty, and therefore Plaintiff did not meet FBIC's second criterion for a medically necessary bilateral breast reduction.

26.  In his evaluation notes, Dr. Hamilton stated that Plaintiff was "interested in a breast reduction; she has a double-D breast with significant back pathology previously documented as certainly related to her significantly heavy breasts."  FBIC Rec. at 0236.  However, there is no evidence in the Administrative

Record that Dr. Hamilton performed an examination of Plaintiff's back, nor is there any documentation connecting Plaintiff's breast size and her back problems, which the Administrative Record evidence indicates were focused on her lower back. Although Dr. Hamilton's stated that Plaintiff had "significant back pathology previously documented as certainly related to her significantly heavy breasts," Plaintiff fails to point out where such documentation appears in the Administrative Record.

27. Plaintiff complains that FBIC did not properly consider Dr. Hamilton's opinion that the mammoplasty procedure was medically necessary. However, ERISA does not require that administrators give special deference to the opinions of treating physicians and does not impose a heightened burden of explanation on an administrator who rejects a treating physician's opinion. *See* Black & Decker Disability Plan v. Nord, 123 S. Ct. 1965, 1970 (2003).

28. Because FBIC based its decision to deny coverage for Plaintiff's mammoplasty on substantial, "concrete evidence in the administrative record," FBIC's decision was not an abuse of discretion.

29. With respect to the abdominoplasty, belt lipectomy, and liposuction, Dr. Hamilton stated in his evaluation notes that "[t]o improve her abdominal appearance, [Plaintiff] would need an abdominoplasty, repair of some diastasis. However, significant

weight loss would need to occur before more diastasis could be repaired. She needs a belt lipectomy and liposuction in her flanks." Id. at 0236. Contrary to Plaintiff's argument, these notes do not conclusively establish that the abdominoplasty, belt lipectomy, and liposuction procedures were medically necessary. FBIC interpreted these notes to mean that Plaintiff "need[ed]" these procedures to improve her abdominal appearance, and that interpretation is not irrational or unreasonable.

30. In the pre-certification request, Dr. Hamilton stated that "we are seeking certification for a ventral hernia repair with Marlex mesh"; Dr. Hamilton did not state or otherwise provide any basis for a conclusion that abdominoplasty, belt lipectomy, and liposuction procedures were either medically necessary components of the ventral hernia repair, or procedures medically necessary to support the efficacy of the ventral hernia repair. Id. at 0019. Based on this evidence and Dr. Brumblay's review thereof, FBIC determined that these procedures were cosmetic because "[t]he record contains no information to show that abdominoplasty or belt lipectomy is for any purpose other than improving appearance." FBIC Rec. at 0487.

31. On appeal, FBIC affirmed its decision after Dr. Heidenreich reviewed Dr. Hamilton's evaluation notes and pre-certification request and agreed that "[a]bdominoplasty, belt lipectomy and liposuction are referred to in original documentation

31

as cosmetic in intent." <u>Id.</u> at 0489.  Thereafter, Dr. Beckman reviewed Plaintiff's medical records and determined (1) that "[t]he liposuction of [Plaintiff's] flanks [was] cosmetic," as [t]here is no other indication for this procedure"; and (2) that "[t]he tummy tuck or abdominoplasty [was] cosmetic," as "[t]he indication for this [procedure] was 'significant abdominal laxity,'" and the procedure was "not an integral part of the medically necessary hernia repair." <u>Id.</u>  Finally, Dr. Dachelet, after reviewing the prior determinations, the appeal letter, and the submitted medical records, including the operative report and the hospital notes following the procedures, agreed that the procedures were indeed cosmetic.  <u>Id.</u> at 0490.

32.  FBIC based its decision to deny coverage for Plaintiff's abdominoplasty, belt lipectomy, and liposuction on substantial, "concrete evidence in the administrative record," FBIC's decision was not, therefore, an abuse of discretion.

33.  Because FBIC gave the terms of the Policy their correct legal interpretation, and because FBIC did not abuse its discretion in determining that Plaintiff's mammoplasty, abdominoplasty, belt lipectomy, and liposuction were "Cosmetic Services," Plaintiff's ERISA § 502(a)(1)(B) claim for benefits fails.

34.  In her trial brief, Plaintiff argues that ERISA-estoppel should be applied in this case.  The Fifth Circuit recently recognized ERISA-estoppel as a cognizable legal theory.  *See* <u>Mello</u>

v. Sara Lee Corp., 431 F.3d 440, (5th Cir. 2005).  To establish an
ERISA-estoppel claim, Plaintiff must show (1) a material
misrepresentation, (2) reasonable and detrimental reliance upon the
misrepresentation, and (3) extraordinary circumstances.  Id.
Plaintiff does not assert an ERISA-estoppel claim in her First
Amended Complaint. *See* Document No. 18.  Regardless, such a claim
would fail because FBIC never represented to Plaintiff that her
mammoplasty, abdominoplasty, belt lipectomy, and/or liposuction
would be covered under the Policy.  To the contrary, FBIC
specifically informed Plaintiff before she underwent these
procedures that they would *not* be covered.  Plaintiff cannot,
therefore, demonstrate that FBIC made a material misrepresentation
upon which she reasonably relied in undergoing the non-covered
procedures.

   35.  Section 502(c)(1) of ERISA provides that:

> Any administrator . . . who fails or refuses to
> comply with a request for any information which
> such administrator is required by this subchapter
> to furnish to a participant or beneficiary (unless
> such failure or refusal results from matters
> reasonably beyond the control of the administrator)
> by mailing the material requested to the last known
> address of the requesting party or beneficiary
> within 30 days after such request may in the
> court's discretion be personally liable to such
> participant or beneficiary in the amount of up to
> $100 a day from the date of such failure or
> refusal, and the court may in its discretion order
> such other relief as it deems proper.

29 U.S.C. § 1132(c)(1)(B).  Although Plaintiff alleged in her First Amended Complaint that she requested her administrative record from FBIC on April 6, 2004 but did not receive the record--which allegedly "failed to include important Plan documents and was incomplete"--until May 14, 2004, *see* Document No. 18 ¶ 33, Plaintiff appears to have abandoned this claim, as she neither addressed it nor provided any evidence in support of it during trial or in her trial brief, *see* Document No. 43.[9]  Regardless, given that Plaintiff has adduced no evidence in support of the claim, she has failed to show that she is entitled to relief under § 502(c).

36.  Although Plaintiff asserted a breach of fiduciary duty claim against FBIC in her First Amended Complaint, *see* Document No. 18 ¶¶ 35-36, Plaintiff appears to have abandoned this claim, as she neither addressed it nor provided any evidence in support of it during trial or in her trial brief, *see* Document No. 43.  Moreover, given that Plaintiff has neither alleged nor presented evidence of a loss to the Policy--as opposed to Plaintiff herself--Plaintiff's claim for individual relief under § 502(a)(2) fails as a matter of law.  *See*, *e.g.*, McDonald v. Provident Indem. Life Ins. Co., 60 F.3d 234, 237-38 (5th Cir. 1995) (establishing a loss to the plan--

---

[9] Plaintiff has not, for example, identified the documents she claims were missing from the Administrative Record, nor has she produced any *evidence* that she requested the file from FBIC on April 6, 2004 but did not receive it until May 14, 2004.

as opposed to the individual participants--is required to prevail
on an ERISA § 502(a)(2) breach of fiduciary duty claim).

37.   Section 502(a)(3) of ERISA authorizes a beneficiary to
bring a civil action "(A) to enjoin any act or practice which
violates any provision of [ERISA] or the terms of the plan, or (B)
to obtain other appropriate *equitable relief* (i) to redress such
violations or (ii) to enforce any provisions of [ERISA] or the
terms of the plan."   29 U.S.C. § 1132(a)(3) (emphasis added).
Plaintiff argues that a constructive trust for equitable
restitution is a form of "other equitable relief" available under
this section and asks the Court to impose a constructive trust on
the amounts that FBIC refused to pay Plaintiff for her mammoplasty,
abdominoplasty, belt lipectomy, and liposuction. *See* Document Nos.
18 ¶ 37; 43 ¶¶ 49-50.   Although Plaintiff characterizes the relief
she seeks under § 502(a)(3) as "equitable restitution," Plaintiff
is in fact seeking to recover the value of the claims FBIC denied
under the Policy.   Such relief is barred by § 502(a)(3).   *See*
Callery v. United States Ins. Co., 392 F.3d 401, 404-06 (10th Cir.
2004) (holding that various remedies sought by the plaintiff,
including what the plaintiff characterized as restitution damages,
were not available because the plaintiff was in actuality seeking
money damages, a classic form of *legal* relief) (applying Great-West
Life & Annuity Ins. Co. v. Knudson, 122 S. Ct. 708 (2002) and
Mertens v. Hewitt Assocs., 113 S. Ct. 2063 (1993)).

38.   Section 502(g)(1) of ERISA provides that in "any action under this subchapter . . . by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g)(1).   In considering whether an award of attorney's fees is warranted, the a court must consider: "(1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to satisfy an award of attorney's fees; (3) whether the award of attorney's fees against the opposing parties would deter other persons acting under similar circumstances; (4) whether the parties requesting attorney's fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and (5) the relative merits of the parties' positions." Bannistor v. Ullman, 287 F.3d 394, 408-09 (5th Cir. 2002) (quoting Iron Workers Local No. 272 v. Bowen, 624 F.2d 1255, 1266 (5th Cir. 1980)).

39.   Although Plaintiff seeks an award of reasonable and necessary attorney's fees, she has not shown under the relevant criteria that she is entitled to such an award.   Plaintiff has not established that FBIC acted in bad faith, nor has she shown that FBIC engaged in culpable conduct warranting deterrence in the form of an award of attorney's fees against FBIC.   Plaintiff sued FBIC on behalf of herself, rather than other Policy participants, and

she has not raised any significant legal issues regarding either the Policy or ERISA itself.  Finally, Plaintiff has not prevailed on any of her claims in this lawsuit.  Thus, Plaintiff is not entitled to an award of attorney's fees.

40.  FBIC seeks a limited award of attorney's fees. Specifically, FBIC seeks to recover $9,727.50 in fees incurred in connection with: (1) FBIC's motion to dismiss unnecessary parties; (2) FBIC's efforts to comply with the Court's mediation order, which efforts were wrongfully frustrated by Plaintiff's counsel; and (3) FBIC's preparing and filing of the Joint Pretrial Order, which properly was the primary responsibility of Plaintiff's counsel.  Counsel for FBIC David T. McDowell, of Bracewell & Giuliani LLP, provides the following verified support for attorney's fees:

> 3.  During the course of this litigation, Bracewell attempted to obtain an agreement from opposing counsel to dismiss Fortis Inc., Fortis Health, Assurant Health, and Assurant, Inc. from the lawsuit since these entities were not proper parties.  These efforts were wholly unsuccessful. As a result, I spent 3 hours: (1) communicating with FBIC concerning the dismissal of these entities; (2) editing FBIC's Motion to Dismiss Fortis Inc., Fortis Health, Assurant Health and Assurant, Inc. with accompanying proof and affidavits; and (3) preparing for and participating in this Court's telephone hearing concerning the dismissal of the above referenced parties.

> 4.  During the course of this litigation, FBIC attempted, on numerous occasions, to mediate this matter.  Specifically, I spent 6.1 hours (1) conferring with opposing counsel in attempt to

obtain a suitable mediation date, mediator, and
mediation in general; (2) communicating with the
Court concerning mediation and mediation dates;
(3) editing and finalizing a mediation statement
for mediator Nancy Huston and communicating with
mediator Nancy Huston's office; (4) preparing for
FBIC to attend the mediation; (5) conferring with
opposing counsel and mediator Nancy Huston's office
concerning Plaintiff's unilateral cancellation of
agreed upon mediation date; (6) reviewing opposing
counsel's Motion to Extend Time to Mediate and
responding to same; and (7) conferring with client
and Court concerning Plaintiff's failure to mediate
his matter.

6. During the course of this matter, I spent 2
hours preparing correspondence to opposing counsel
regarding his duty to prepare and file the Joint
Pretrial Order on November 15, 2005 and editing and
finalizing FBIC's Proposed Pretrial Order and
findings of fact and conclusions of law.

4. [sic]  I have spent a total of 11.1 hours on the
above referenced matters.  My hourly rate is $305
per hour; therefore, an award of $3,385.50 for my
attorney's fees is reasonable.

Document No. 45 ex. B.  Additionally, Kirsten B. Cohoon, counsel

for FBIC, avers by affidavit that she spent 11.6 hours in

connection with the Motion to Dismiss, 11.1 hours in connection

with the mediation efforts, and 7.5 hours in connection with the

Joint Pretrial Order, resulting in $6,342.00 in fees to FBIC.  Id.

ex. C.

After applying the <u>Bowen</u> factors to FBIC's request, the Court declines to impose an award of attorney's fees on Plaintiff.[10] Although the fifth <u>Bowen</u> factor weighs in favor of an award to FBIC, as the relative merits of the parties' positions weigh entirely in FBIC's favor, the remaining factors counsel against an award of fees.  First, there is no evidence that Plaintiff, as opposed to her attorney, was responsible for the bad faith/culpable conduct about which FBIC complains.  Second, there is no evidence bearing on whether Plaintiff would be able to satisfy an award of attorney's fees against her.  Third, because there is no evidence that Plaintiff was responsible for the bad faith or culpable conduct about which FBIC complains, there is no conduct on the part of Plaintiff that an award of attorney's fees should be imposed to deter.  Finally, FBIC's efforts here did not seek to benefit all participants or beneficiaries of the Policy or to resolve a significant legal question regarding ERISA.   Thus, the <u>Bowen</u> factors weigh against adjudging against Plaintiff even a limited award of attorneys' fees.

41.   FBIC is entitled to a take-nothing judgment against Plaintiff on all of her claims.

---

[10]   Importantly, FBIC has sought to impose an award of attorney's fees against Plaintiff, not her counsel.  Indeed, the Court views with disapprobation the conduct of Plaintiff's counsel about which FBIC complains.

42.  If any of the foregoing Findings of Fact constitute Conclusions of Law, they are adopted as such; and if any of the foregoing Conclusions of Law constitute Findings of Fact, they are adopted as such.

The Clerk shall notify all parties and provide them with a true copy of these Findings of Fact and Conclusions of Law.

SIGNED at Houston, Texas, on this 18th day of January, 2006.


_____
EWING WERLEIN, JR.
UNITED STATES DISTRICT JUDGE